NOTE.—See Matter of Jacobs, 2 *N. Y. Crim. Rep.* 346; affirmed, *Id.* 539; Matter of Paul, *Id.* 1; People *v.* McGann, 3 *N. Y. Crim. Rep.* 1; People *v.* Marx, *Id.* 11; reversed, *Id.* 200.

---

## Supreme Court—General Term—Fifth Department.

*January*, 1885.

## PEOPLE *v.* NEWTON.

CIRCUMSTANTIAL EVIDENCE.—FOOTPRINTS.—NEW TRIAL UNDER SECTION 527, CODE CRIM. PROC.—ARSON.

To convict a defendant, the jury are required to find that the facts presented remove reasonable doubt of his guilt, and to support such conclusion, it must be founded on testimony giving facts legitimately pointing in that direction.

Where resort is had to circumstances, to be effectual, they must do more than create suspicion or moral belief that the party charged is the guilty one. They must, as facts, be sufficient to produce the legal

standard of belief or conviction of his guilt, to justify that conclusion of a judicial tribunal expressed by a jury.

Tracks made in the soil, though they correspond in dimensions with the shoes worn by the party charged, have but little significance, unless there be some distinguishing peculiarity in such tracks and shoes.

Accordingly *held*, after an exhaustive review of the facts upon which defendant was convicted of arson in the third degree, that the verdict was against the weight of evidence, and that justice requires the direction of a new trial under section 527, Code Crim. Proc., although no exceptions were taken.

APPEAL from a judgment of the Court of Sessions of Erie County, Hon. WILLIAM W. HAMMOND, county judge, presiding, with associates and a jury, convicting the defendant Erastus Newton, of arson in the third degree.

On the evening of May 5, 1883, the barn of Frank Seneca, on his farm, situate in the town of Brant, county of Erie, was destroyed by fire. On the following day the defendant was arrested, charged with the crime of setting it on fire, was afterwards indicted, and at the Court of Sessions of that county in July, 1883, was tried on that indictment, found guilty by the verdict of the jury, of the crime of arson in the third degree, and by the judgment of the court was sentenced to imprisonment in the Erie county penitentiary for the term of three years.

This appeal is taken from that judgment.

There were no exceptions taken on the trial requiring consideration, the contention being that the evidence which was mainly circumstantial, was not sufficient to justify a conviction.

*Walter W. Holt*, for the prisoner, appellant.

*E. W. Hatch*, district attorney, and *George T. Quinby*, for the people, respondent.

BRADLEY, J. [After above statement.]—The statute provides that the " appellate court may order a new trial if it be satisfied that the verdict against the prisoner was against the weight of evidence, or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below." *Code Cr. Pro.* § 527.

There is no direct evidence that the defendant committed the act in question, or that the destruction of the barn by fire was occasioned by the felonious act of any person. The evidence on the part of the people tended to prove that the fire was not produced by any act or neglect of the occupant of the building or his servants, and that it was on fire within a short time after an employee of the owner left it in good condition. The evidence was sufficient to send to the jury the question whether or not the burning was the act of an incendiary, although by no means conclusive that it was.

The defendant resided in the village of Irving, in the county of Chatauqua, and from two-thirds to three-fourths of a mile from the barn. On the line between that and Erie county, is Cattaraugus creek, over which there was a bridge of a highway leading northerly from Irving to a place called Farnham. From this highway, a short distance from the bridge, a road leads from it in an easterly direction and passes within a few rods of the barn in question. And from the north end of the bridge was a foot-path leading up the creek in the direction of the barn. On the day after the fire (Sunday), tracks of a person going to and from the barn, were found in this path, and some of them were measured. Tracks were also found in a path through a vacant lot in the village of Irving, leading to an entrance into the house where the defendant resided. One of the tracks found there was measured, and corresponded in dimensions with those measured in the path first mentioned. It did not appear that there was anything peculiar or extraordinary in the shape or dimensions of the track to distinguish it from those of others of like size. It also appeared that adjacent to the path leading from the bridge to the barn, was a small willow stump from the bottom of which had grown up some sprouts or limbs, that one of them was found broken down, indicating that it may have been done by contact with it of some person passing along there; and a place in the path where it was soft and muddy, had the appearance that some person had fallen on one knee.

The evidence tended to show that the person making the tracks was running there. One witness testifies to the effect that on the evening of and a while before he discovered the

fire, he saw the defendant in the highway north of the bridge and between it and the place where the road leading from this highway to the premises on which the barn was located started; that the defendant was then five or six rods from the bridge and walking rapidly toward it and went on to it. This witness states the time when he saw the defendant to have been between nine and ten o'clock.

Testimony was given of conversations with the defendant in the village of Irving while the barn was burning. One witness asked him where the fire was, and he answered that he did not see any, although the witness could see the·blaze distinctly and it "lighted up the sky." Of another he asked where the fire was, and on being informed, asked if the witness thought Frank's horses were in the barn. And by another he was asked who could be so hard-hearted as to do such a thing (as to set the fire), and answered, " It will not be best for a man to say; it will undoubtedly be laid to Lowell Strong." It appears that on that morning Frank Seneca had been arrested on complaint of Lowell Strong, and taken to Jamestown on a criminal warrant, and that the defendant was subpœnaed and attended as a witness on the part of the prosecution; that the defendant returned that evening about seven o'clock, and Seneca did not return until the next morning.

As bearing on the question of motive, it appeared that on two occasions about a year and in the fall before the fire, the defendant and Seneca had fights in which the latter was the victor. They had been well acquainted from early boyhood, and those were the only occasions of quarrels or contests so far as appeared. It did not appear that the defendant had ever made any threats to do Seneca any injury, nor did it appear what their relations were, further than as before stated.

This constitutes substantially the evidence on which the people relied to charge the defendant with the crime, except some matters which will be hereafter mentioned in connection with other testimony bearing upon them. The view entertained by the prosecuting counsel evidently was that the person whose tracks appeared in the path first referred to, was going rapidly, ran against the willow stump or the bush growing from it, and then broke off the twig or limb, and stumbled

and fell on his knee, and in that manner made the impression found there in the soft earth. And when the arrest was made the officer requested, and the defendant went with him into the house and furnished the pantaloons he wore on the day of the fire (Saturday.) There was no mud on them, but they had been torn and sewed up near the knee, and there was some blood on the inside of them at or near that place. Those pants were retained by the officer, and produced and exhibited at the trial. On the part of the defense, testimony of two witnesses was given, that on the Sunday previous to that of the arrest, the pants were so torn, and he was slightly injured by coming in contact with a barbed wire fence, and his mother testified that she sewed up and mended them some time before he went to Jamestown. And another witness testified that on the morning of that day (May 5), he noticed that the pants had been torn and mended as they appeared to have been when produced at the trial. They were the same he wore Saturday.

When arrested the defendant manifested no unwillingness to go with the officer, and said nothing of significance.

The shoes he had on at the trial were the same he wore on the day he went to Jamestown. They were then measured in court, and the length was then one-eighth of an inch less than that made by the measurement of them on Sunday morning after the fire, when they were new. And it appeared that they had been worn off some in the meantime. On that Sunday morning, by reason of the charge there made against him, the defendant was induced to walk and run with those shoes on, and to permit the tracks there made and the shoes to be measured; and it appears that the tracks found and measured in the two paths, as before mentioned, did not correspond with those so made Sunday morning, nor with the measurement of the shoes then made, but were smaller in size than the shoes, and still smaller than the tracks made with them Sunday morning; so much so that it quite satisfactorily appeared that those found of the person going to and returning in the path leading from the bridge to the barn could not have been made with those shoes, if it be assumed that the measurements were correctly given. These were, in fact, the shoes the defendant wore to Jamestown on Saturday, the day of the fire, and there is no

evidence tending to prove that he wore any other shoes that evening, but the inference derived from the testimony is that he did not change his shoes after his return from Jamestown that evening.

The testimony of the witness that he saw the defendant that evening approaching the bridge from the north in the highway did not necessarily support the theory that he came from the barn to the bridge in the path referred to, as that path led down the creek and entered the highway near the north end of the bridge. But on the whole testimony, the question whether that witness was not mistaken on the point of identity of the person was a serious one. It was after dark. He was unable to say how he was dressed. He was thirty to thirty-five feet from him, and did not speak to him. This, he says, was from one-half to three-quarters of an hour before his attention was called to the fire.

The testimony of several witnesses was given in respect to the whereabouts of the defendant that evening, to the effect that he returned from Jamestown to Irving about seven o'clock; that he was in the store of Lyman Newton, in Irving, about eight o'clock; that he went with some persons to a fish-house or shanty at and on the south side of the creek near the bridge, and from there went on the bridge to look down the creek to see if the fishermen were engaged drawing a fishing seine, and returned in five minutes to the fish-house; that he was seen standing on the bridge about that time in the evening by witnesses called on the part of the prosecution; that he obtained a fish, dressed it there, and with his comrades went back to the same store, obtained a paper, wrapped up his fish, and went to the store of Christy on the opposite corner of the street, and laid his fish on a barrel; that from there he went across the street to a hotel, remained but a short time, and returned to Christy's store and remained there some time, bought beans and cheese, and a few minutes before nine o'clock left there with his packages, stopped at the hotel, left there about nine, and was seen on his way toward home about or a few minutes past nine. A few minutes after that, the fire was discovered. His mother says that he came into the house with the beans, &c., and left them and went out, not far from nine

o'clock, and shortly after her attention was called to the fire, and that he did not return until the fire was nearly over.

Witnesses testify that about ten minutes past nine, the defendant was seen going from his home towards the residence of Lyman Newton; that he went there and called upon Newton (who had then retired); that this was before the discovery of the fire, and that when it was discovered and the blaze of the fire was plainly visible, he was on the same street going towards his home. This was the time his attention was called to the fire as before mentioned. The actual locality of the fire was not apparent to view from the point where the defendant then was, and he made the expression that the fire must be at Farnham, and a witness gives that as his impression when he first saw it. Farnham was a place beyond and north-westerly from the barn. The defendant then went to a locality in Irving from which the place of the fire could be seen, where several persons were assembled looking at it.

This fire was discovered some time between nine and ten o'clock. The testimony relating to the time differed from fifteen to forty-five minutes past nine o'clock. The distance from the bridge to the barn was about eighty rods; from Christy's store to defendant's home, from eighty to one hundred rods; from Christy's store to the bridge about twenty-five rods, and the bridge was somewhere from ten to twenty rods in length.

Those already referred to, are in the main the circumstances and situations presented by the testimony and submitted to the jury. To convict the defendant, they were required to find that the facts presented removed reasonable doubt of his guilt, and to support such conclusion it must be founded on testimony giving facts legitimately pointing in that direction. It is not sufficient that he may have committed the act, but it must be established that he did. Crime deliberately conceived is not usually committed publicly, nor purposely exposed by the guilty, and direct evidence is not always available to establish his guilt, but resort is necessarily had to circumstances pointing him out as the culprit. Yet, to be effectual, they must do more than to create suspicion or moral belief that the party charged is the guilty one. They must, as facts, be sufficient to produce the legal standard of belief or conviction of his

guilt, to justify that conclusion of a judicial tribunal expressed by a jury.

In this case, the *corpus delicti* is not free from doubt, although there was sufficient to go to the jury on that question. Nothing is found about the premises to show in what manner the fire was produced, at what particular place at or in the building the fire commenced to burn. Nor is there any evidence, relating solely to the fact of the fire, that it was feloniously set, other than the inference derived from the testimony of the manner in which the barn was constructed, used, and kept closed, the care used by the servant of the owner in the evening of, and before the fire, when he was there with a lantern, and the condition and situation in which he then left it.

Assuming that the barn was purposely burned, nothing appears to justify inference of motive of gain or profit on the part of the defendant from the act, and it can be found only in the spirit of revenge or wantonness. The tests of physical strength, or fights, between him and the owner, do not appear to have been preceded or followed, for any considerable time, by demonstrated animosity, and no threats by the defendant appear to have been made. It is difficult to see in this, sufficient evidence of motive to characterize equivocal circumstances, or to impress upon them evidence of guilt, or purpose to commit the crime, much if any more than their inherent quality imports.

Taken as a whole, and in view of all the testimony qualifying and explaining, and without overlooking the matter of credibility of witness, so far as that test seems to have been applicable or proper for the consideration of the jury, the circumstances presented by the proofs seem to fall below that degree of certainty as evidence of the guilt of the defendant, required to permit the conviction to stand, in view of the duty of this court to examine the facts and grant new trials in such cases as directed by the statute referred to. Tracks made in the soil, although they correspond in dimensions with the shoes worn by the person charged, have but little significance, unless there be some distinguishing peculiarity in such tracks and shoes.

The proof on the question of *alibi* embraces the testimony of so many witnesses, some of whom, giving material testimony in

that respect, cannot (as appears by the record) be treated as unreliable, that the evidence of at least probable inability of the defendant to have committed the act after eight o'clock in the evening does not appear to have been manufactured for the purposes of the defense.

It is unnecessary to refer to the familiar and general rules relating to the quality and sufficiency of circumstantial evidence in the legal sense, so far 'as they have been declared by law, text and judicial. Each case has its peculiarities, and must be governed largely in that respect by those which it developes. In this case, the verdict is clearly against the weight of evidence, and justice requires the direction of a new trial. The judgment appealed and conviction should be reversed, and a new trial granted.

BARKER, HAIGHT and LEWIS, JJ., concur.